**FIREFIGHTERS UNITED
FOR FAIRNESS, et
al., Plaintiffs,**

v.

**CITY OF MEMPHIS, Defendant.**

**No. 02–2431–BBD.**

United States District Court,
W.D. Tennessee,
Western Division.

March 28, 2005.

Richard B. Fields, Esq., Law Office of Richard B. Fields, Memphis, TN, for Plaintiffs.

Louis P. Britt, III, Esq., Chad Ashley Dickson, Ford & Harrison LLP, Memphis, TN, for Defendant.

Kenny W. Armstrong, Memphis, TN, pro se.

## MEMORANDUM OPINION AND ORDER

DONALD, District Judge.

Plaintiffs, an unincorporated association of certain employees of the City of Memphis Fire Department and some individual members of that association, bring this suit under 42 U.S.C. § 1983 against the City of Memphis alleging that they suffered due process violations and racial discrimination in violation of rights protected by the Fourteenth Amendment to the United States Constitution during the City's administration of the 2000 Memphis Fire Department Promotional Process. Plaintiffs originally filed suit in the Chancery Court for Shelby County, Tennessee on May 1, 2002, naming the City of Memphis, Director of the Memphis Fire Department Chester Anderson, and Dr. Mark A. Jones, the consultant who created and administered the promotional exams, as defendants. The case was subsequently removed to this Court. By way of the Plaintiffs' Second Amended Complaint ("Complaint"), on August 13, 2002, Defendants Anderson and Jones were dropped from the suit, leaving only the City of Memphis as a defendant. A bench trial was conducted on July 26 and 27, 2004, with final argument and proposed findings of fact and conclusions of law submitted by the Defendant on October 1, 2004. Despite two separate extensions of time, the Plaintiffs have thus far not offered their own proposed findings of fact and conclusions of law, nor have they responded to the final submissions and arguments of the Defendant. Thus the Court will proceed to issue its decision on the record. Upon consideration of the total record, including the testimony of witnesses, and for the reasons set forth in this opinion, the Court finds that Plaintiffs' constitutional rights were not violated by the City of Memphis. Accordingly judgment is ENTERED in favor of Defendant.

## FINDINGS OF FACT

1. Plaintiff Firefighters United for Fairness ("Firefighters" or "FFUF" or "Plaintiff") is an unincorporated association composed of African–American employees of the City of Memphis Fire Department ("MFD") who allege that they suffered racial discrimination during the fire department's 2000 lieutenant and battalion chief promotional process. The individually named Plaintiffs composing Firefighters are Lt. Donald Atkins, Lt. Alan Bradshaw, Lt. John A. Brown, Lt. James Beasley, Lt. Everett R. Frazier, Lt. Elbert Jackson, Lt. Larry L. Harris, Lt. Richard Holliday, Lt. Ulysses Jones, Jr., Lt. Ronald Moore, and Private Sandra Richards.[1]

2. The City contracted with Performance Associates, an industrial organizational psychology consulting firm, to develop and administer the 2000 MFD promotional process. Dr. Mark Jones is the principal of Performance Associates and had developed and administered prior promotional processes for the City's police department. Based on Dr. Jones' success devising race neutral promotional processes for the Memphis police department, the United States Department of Justice recommended that the City hire Performance Associates to develop and administer the City's Fire Department 2000 promotional process, after the City apparently experi-

---

1. Private Richards was promoted to the rank of lieutenant in 2003, during proceedings in this Court. At the time of the bench trial of this matter, Lt. Jones had not been promoted to the rank of battalion chief. All of Plaintiffs' evidence adduced at trial was in relation to the claims of Jones and Richards, who were also the only witnesses for the Plaintiffs. The Court is unaware of the ranking or employment status of the remaining Plaintiffs in this action.

enced some problems with a different consultant initially hired to administer the 2000 promotional process.

3. On December 29, 1999, the MFD announced an elective process for promotion to lieutenant and battalion chief. Interested individuals were permitted to sign up for the process, and all eligible candidates were issued a 2000 Study Guide for the process.

4. As devised by Performance Associates, the lieutenant promotional test was comprised of three separate elements which were scored and then aggregated to arrive at the candidate's final ranking on the promotional roster. The three components were a written job knowledge test weighted 22.5%, a practical video test weighted 70%, and a seniority credit, based on the candidate's service in the MFD, weighted at 7.5%.

5. The battalion chief promotional test consisted of a practical video test weighted 48%, an in-basket exam weighted 27%, a group interpersonal skills exercise weighted 17.5%, and a seniority credit weighted 7.5%.

6. The practical video component, the portion of the tests most contested in this litigation, consisted of a candidate's videotaped response to a fact situation that raises problems commonly encountered by MFD lieutenants or battalion chiefs. The responses were recorded both on audio tape and videotape, and were then transcribed from the audio tape. The videotape served as a back-up to the audio tape where the audio tape was inaudible to the transcribers. In order to maintain anonymity in the grading of the practical video component, transcripts were identified only by examination numbers unique to that candidate when being scored by assessors. The battalion chief group problem solving exercise component was designed to test leadership and interpersonal skills, not aspects of firefighting knowl-

edge, and was therefore graded by consultants rather than the outside assessors used in the practical video components. The group problem solving exercise was videotaped and scored directly from the videotape by the consultants.

7. Performance Associates utilized subject matter expert ("SME") panels to devise answer keys to be relied upon by the assessors who graded the transcripts of the practical video components. SMEs were persons deemed to have intimate knowledge of the job requirements for which they were experts, and were also ineligible to compete in the promotional process for the job at issue.

8. In a further effort to assure anonymous grading of the video based tests, assessors from outside the MFD were utilized by Performance Associates in scoring the transcripts. Though a small number of the assessors did come from Shelby County, most of the assessors were from other large cities in the region. Assessors were employed based on their knowledge of the job requirements for which they were evaluating, and were additionally trained in how to interpret the responses of the candidates when grading against the answer keys developed by the SME panels. Assessors utilized by Performance Associates included both African–American and white individuals.

9. In preparation for the exam, Plaintiffs were provided the same test review materials, at the same time, as non-minority candidates.

10. Plaintiffs had the same amount of time to study as non-minority candidates.

11. Plaintiffs had the same amount of time to take the test as non-minority candidates.

12. Information relevant to the testing process, the review process, and other issues related to the promotional process

was relayed from Performance Associates to the MFD and then disseminated by the MFD to the candidates.

13. Then Lieutenant Jason Stevens, a white male, served as the MFD liaison with Performance Associates during the 2000 promotional process. As liaison, Lt. Stevens helped Performance Associates coordinate with the MFD on logistical issues related to the promotional process. Lt. Stevens also participated in the 2000 battalion chief promotional process, but was shielded by Performance Associates from all materials related to the battalion chief test, and did not participate in formulating the content of the test. Subsequent to his testing, but prior to the release of the initial battalion chief promotional roster, Stevens was promoted to the rank of battalion chief based on his placement on the previous promotional roster, which was still operative at that time. Stevens was therefore omitted from the initial 2000 battalion chief promotional roster.

14. Performance Associates utilized a two-rater system in scoring the candidates' transcribed exams. Thus, each transcribed scenario was reviewed independently by two assessors who scored the response based on the answer key developed by the SME panel. To address the highly subjective nature of such a scoring method, Performance Associates initially employed a computerized decision model to alert test administrators to situations where two assessors had given widely differing scores on the same scenario. Thus, prior to the compilation of the initial promotional roster or assignment of any ranking to a candidate, Performance Associates was able to address, with the individual assessors, any scoring discrepancies that were beyond the model's parameters of reasonable disagreement or judgment. Consistency of assessor scoring was also reviewed by Performance Associates when raised by individual candidates during the review process.

15. Despite the utilization of the two-rater system, due to time and fiscal constraints, 18 of the 118 battalion chief candidates were graded on three different scenarios by only one assessor for each scenario. However, Performance Associates had ensured the reliability of each single assessor's scoring over the first 100 candidates, and therefore was certain that the assessor was qualified to render a fair and accurate score that would then be doubled to simulate the two-rater score on other scenarios.

16. The initial review process, prior to the compilation of the first promotional roster, was held soon after the scoring of the candidates' exams. Because of the sheer number of candidate exams and lines of transcript involved,[2] Performance Associates devised the review process to place the onus on the candidates to discover transcription, scoring, and clerical errors not already uncovered by Performance Associates. Candidates were given the opportunity to review their transcript, with the scores of the assessors, and were provided the answer key for each scenario. Plaintiffs were also provided with the videotape of their practical video test, in order to review the accuracy of the transcripts given to the assessors. During the initial review process, candidates were given just one hour to review their practical video test after it was scored.

17. Candidates were instructed to submit inter-departmental "redlines" citing specific concerns with their exams after

---

**2.** The battalion chief promotional process involved 118 candidates, while the Lieutenant promotional process involved 541 candidates. Each candidate was tested on numerous scenarios of varying lengths and complexity, resulting in responses that ranged from just a few lines of transcript to a page or more of transcript per scenario.

their initial review of the test. Performance Associates received approximately 264 redlines and reviewed them, making changes to scores where appropriate, prior to the release of the initial promotional roster. Performance Associates determined that most of the redlines were actually disagreements with the judgments of the individual assessors, and therefore disregarded those contentions when the assessors' scoring was within the model of consistency employed by Performance Associates.

18. Performance Associates released its initial ranking for the 2000 promotional process on January 12, 2001.

19. In January and February 2001, responding to various issues raised by candidates subsequent to the release of the initial promotional roster, Performance Associates issued general memoranda to all MFD fire suppression candidates.

20. In a January 23, 2001 memorandum, Performance Associates explained that every submitted redline was carefully examined and changes were made when appropriate. The memo further addressed specific concerns raised by some candidates, including: why a marginal number of responses were graded from the videotape rather than the transcript, why some in-basket answer sheets did not have ratings on the back, why some transcripts appeared incomplete or inaccurate, and how that may have affected the candidate's score, why lieutenant candidates were not allowed to see their responses to the written test, who the assessors were, and whether parts of some of the answer keys should be re-evaluated. Performance Associates addressed each issue in turn, carefully explaining its methodology or rationale in administering the test, and in all cases assuring the candidates that, where appropriate, scores were changed to reflect problems inherent in the form, content, or grading of the exam. For in-stance, in the memorandum, Performance Associates explained that, based on numerous redline challenges to some of the answer keys, SMEs reviewed the answer keys and this resulted in the deletion of one of the scenarios on the lieutenant practical video test. Because the scenario was deleted, Performance Associates awarded all candidates full credit for the scenario, and revised scores accordingly.

21. In a second memorandum, dated February 1, 2001, Performance Associates advised candidates on how scores were calculated, divulged the highest scores for each component of each test so that candidates could calculate their scores, and addressed separate issues including how scores were calculated in instances where only one rater was utilized.

22. After the release of the initial ranking, the MFD continued to receive redlines and other complaints regarding the promotional process. In response, Performance Associates re-reviewed all of the original 264 redlines, as well as the approximately two dozen new redlines submitted after the release of the initial ranking. During this second review, Performance Associates corrected the scores of twenty-one or twenty-two candidates, ten of whom had been assigned the wrong score due to mislabeling of their tape prior to transcription, five of whom had their seniority credits corrected, and six or seven of whom had transcription problems corrected.

23. On March 12, 2001, Performance Associates released a revised promotional roster reflecting changes made to scores in the second round of the review process.

24. Some candidates' rankings were enhanced greatly due to the review processes. For example, Plaintiff Richards improved her ranking from 324 on the initial lieutenant promotional roster to 108 on the revised ranking issued in March.

Similarly, Ronald Taylor, a white male, moved from 326 on the same initial roster to 109 on the revised ranking. Because the lists were relative, fluctuation in one candidate's ranking affected the ranks of all other candidates. Thus, as one candidate, minority or not, moved up, other candidates, minorities and non-minorities alike, experienced corresponding changes in their own rankings.

25. Plaintiff Richards reviewed her test during the initial review process on December 19, 2000. She used the entire hour granted her to review the test and video and to begin completing a redline noting instances where her transcript was inaccurate or incomplete, or where she differed with the assessors' scoring. Because Richards was denied the ability to make a photocopy of her redline, she requested an additional redline and began copying her original by hand. Though she turned in her original redline on December 19, Richards continued to make additional and supplemental notes to her second redline after turning in her first redline.

26. As part of its initial review process, Performance Associates adjusted Richards' score based on her initial redline, prior to assigning her an overall ranking for the initial promotional roster.

27. Richards contacted MFD Director Anderson on December 20 noting several concerns with her test, and submitted to him her second redline, which contained quite a bit of additional information not included in her original redline. Performance Associates received her second redline and reviewed it during its second review process discussed above. Based on her more detailed challenges to the scoring and transcription of her test, Performance Associates increased her score by numerous points and her ranking went from 324 to 108 on the lieutenant promotional list.

28. In June 2001, Richards again alerted Director Anderson to perceived deficiencies in scoring of her exam and argued that she should have received an additional five points in scoring her practical exam. Richards also raised issues with scenarios 10 and 14, though she had not contested the scoring of scenario 10 in either of her prior redlines.

29. Richards' complaints largely stem from her disagreement with the judgment of the assessors in scoring her responses, and her perception that the MFD has not adequately responded to her complaints. Though at times in her testimony she alleged problems with how scores were calculated, she articulated no problem with the testing methodology. She does not know of any candidates who were treated differently than her in regard to their ability to review their tests, note issues on redlines, have their tests re-scored, or challenge the judgments of the various assessors.

30. Plaintiff Jones failed to review his test during the assigned period for review prior to the release of the initial battalion chief promotional roster. However, he was allowed to submit a redline after the initial review process. The redline submitted by Jones raised several issues with assessor judgments and the legitimacy of some of the scenarios. Pursuant to test administration policy made aware to all candidates prior to the test, Performance Associates refused to respond individually to challenges made by Jones or any other candidate who submitted a redline. Rather, Performance Associates reviewed each redline and revised scores where appropriate. Though Jones did not make any transcription error claims in his initial redline or subsequent correspondence with the Director or Performance Associates, he did make such a claim during his trial testimony.

31. Plaintiff Jones scored the highest grade on the battalion chief group problem

solving exercise component, the only component that required the graders to score from a videotape and therefore the only component where the graders were aware of the race of the candidate they were scoring.

32. Jones' complaints with the promotional process seem largely to be disagreements with the judgments of the SMEs who devised scenarios and answer keys and with the assessors who scored his responses using those answer keys. Other than a vaguely articulated suspicion that some conflict or impropriety inhered in Lt. Stevens role as liaison with Performance Associates, Jones does not claim that any candidates were treated differently than him in regard to access to testing materials and the review process. Indeed, MFD and Performance Associates made specific exceptions to the regulations regarding review of the test in order to allow him to review his test well after the review period had closed.

33. FFUF conducted its own assessments and re-scoring of its members' tests, as well as a small cross-section of non FFUF members' tests. FFUF members did not receive training in interpreting candidate responses similar to the outside assessors utilized by Performance Associates. Further, FFUF members, including Plaintiffs Richards and Jones, graded their own exams and assigned themselves revised rankings based on their scoring of their own tests. Plaintiff Richards, while holding the rank of private, participated in the re-scoring of all FFUF member examinations, including those who were testing for promotion to battalion chief. Thus, she was interpreting the responses of candidates with more experience than her and who were testing for promotion to a rank multiple levels above her own.

## CONCLUSIONS OF LAW

Plaintiffs bring this action under 42 U.S.C. § 1983. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343. Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Though Plaintiffs' complaint articulates only a due process claim pursuant to § 1983, during summary judgment proceedings in this Court Plaintiffs additionally complained of racial discrimination on the part of the MFD in allowing some white candidates to participate in the promotional process despite their alleged lack of time in grade necessary to qualify for participation in the promotional process. In their Second Amended Complaint, Plaintiffs claim that upon the effective date of the test, numerous named candidates did not have the necessary time in grade to receive a promotion to the rank of battalion commander. Though the complaint does not allege that any of those persons are white, one of the candidates, Gina Y. Sweat, was specifically referred to in summary judgment proceedings as an example of the MFD's favorable treatment of white candidates. *See* Affidavit of Plaintiff Sandra Richards in Support of Plaintiffs' Memorandum In Opposition To Defendant's Motion For Summary Judgment ("Richards Affidavit"). Thus, given all of the above, the Court will construe Plaintiffs' pleadings to present claims for violations of both due process and equal protection rights guaranteed by the Four-

teenth Amendment in their § 1983 action, and will address each of these claims in turn.

## I. DUE PROCESS CLAIM

■ The Due Process Clause of the Fourteenth Amendment reads as follows: "No state shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV § 1. Plaintiffs claim that they were denied due process by the City's refusal both to correct the Plaintiffs' test scores or respond to Plaintiffs' analysis of the testing procedure and their alleged proper scores. This Court has previously held that the mutual understanding between Plaintiffs and the City that the tests would be scored correctly and would be a significant element in the promotional process was sufficient to create a property interest in a correct score. Order Denying Defendant's Motion For Summary Judgment at 5 (*citing Paskvan v. City of Cleveland Civil Serv. Comm'n.*, 946 F.2d 1233, 1235–1237 (6th Cir.1991)). In *Paskvan,* the Sixth Circuit held that the plaintiff had no cognizable substantive due process right involved in his claim that the defendant failed to carry out the purported mutual understanding concerning promotional procedures. *Id.* at 1236. Thus, Plaintiffs' due process claim will be limited in scope to a procedural due process claim.

■ In order to state a claim for violation of procedural due process under 42 U.S.C. § 1983, Plaintiffs must show that they were deprived of a property interest and that the procedures afforded to protect that interest were insufficient. *Silvernail v. County of Kent,* 385 F.3d 601, 604 (6th Cir.2004). The Plaintiffs must first show that they have been deprived of some protected property interest. As discussed above, Plaintiffs do have a property interest in the mutually held expectation that their tests will be graded fairly and accurately, and that the tests will be a major factor in the City's promotional decisions. However, Plaintiffs have not proffered a compelling argument that they have been denied a fair and accurate score.

Plaintiffs' basis for arguing that their scores are incorrect, after transcription problems were corrected during the review processes, stem mostly from their own disagreements with the subjective judgments of the trained and experienced assessors who graded their tests. For example, in Plaintiff Richards' June 2001 memo to Director Anderson, she specifically claimed that she is entitled to two points on scenario 10 of the lieutenant practical video test, rather than the zero points she received. Exhibit 9. Richards did not raise any issues with the grading or transcription of scenario 10 in either of her previous redlines that were reviewed by test administrators. Testimony of Richards at 92.[3] At trial, Richards also conceded that her purported entitlement to the two points stems not from a transcript problem, but from her belief that assessors simply scored her response incorrectly. Richards at 94–95. Her testimony regarding the scoring of scenario 10 is consistent with her general discounting the role of discretion in assessor scoring of the exam:

Q Would you agree with me that there is some judgment that they exercised in giving scores?

A [Richards] I would say that judgment could be rendered without the correct information. If the transcript is wrong, the grades are going to be wrong, so I beg to differ.

---

3. Citations to the trial transcript will hereinafter be cited by reference to the last name of the witness (Plaintiffs Richards and Jones, and defense witness Dr. Jones) and the page number in the transcript where the cited testimony appears.

Q So there is no judgment? Either the transcription is right and you get the points or you don't, is that it?

A According to my interpretation.

Richards at 85. Richards' failure to credit the role of discretion in scoring underscores the larger problem with Plaintiffs' claims that they have received incorrect scores. In a testing system such as the one employed by the city, test administrators must defer to the judgments of the trained and experienced assessors once transcription and other problems are addressed or the time during which such problems are to be addressed has passed.

Plaintiffs' and other candidates' challenges to the legitimacy of scenarios as a whole resulted in changes to the test where warranted. Through employment of highly experienced SMEs and assessors trained in interpreting candidate responses, test administrators undertook careful measures to ensure that the examination was formulated to fairly test fundamental aspects of the job. Further, by channeling the discretion of the assessors through the two-rater system that required both raters to score each scenario within acceptable ranges of judgment, test administrators ensured that the capricious whim of individual assessors would not contribute to any alleged incorrect scores. In the few cases where test administrators relied on a single rater to render a score for an entire scenario, the administrators had assured themselves that the judgment of the single assessor had been proven over the great majority of graded scenarios to be reliable, consistent, and not arbitrary.

To the extent that Plaintiffs argue that clerical or transcription problems resulted in denying them a correct score, their arguments are blunted by the actual results of the test. Where appropriate, clerical or transcription errors noted by candidates or administrators were corrected, and scores revised accordingly. The mere fact that Plaintiff Richards improved her overall ranking on the lieutenant promotional roster from 324 to 108 on the revised ranking suggests that administrators carefully examined claims of error raised in the review processes in an attempt to render the correct score. Though Richards attacked the statistical methodology used in calculating final scores as erroneous, *see* Richards at 34–35, and 47–48, she also conceded that her overall score was correct based on the grades given her. Richards at 101. Further, *Paskvan*, the case cited by Plaintiffs in establishing their property interest in the mutual understanding that their tests would be scored correctly, also holds that "[r]efusal to promote based upon negligence, oversight, or inadvertence is not actionable." 946 F.2d at 1236. Thus, to the extent that Plaintiffs argue that they were deprived their interest in a correct score, their argument likely fails because administrators made substantial good faith efforts to correct scores that were legitimately found to be incorrect, and, to the extent that clerical and transcription errors may have resulted in scores that are incorrect even after the two separate rounds of review by administrators, such "negligence, oversight, or inadvertence" may not be the basis of an action under § 1983.

■ Though the Court finds that the Plaintiffs have not proven that they were denied correct test scores, the thrust of the Plaintiffs' due process argument appears to be concerned with Plaintiffs' perception that the City has not adequately responded "to plaintiffs' analysis of the testing procedure and what the proper scores should be." Complaint at 2, ¶ 3. Plaintiffs therefore appear to be arguing that the City has not afforded them sufficient process prior to depriving them of their protected interest in a correct test score. Assuming, arguendo, that Plaintiffs

have been deprived of that interest, the Court finds that the City has afforded Plaintiffs sufficient process prior to such a deprivation.

In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court established a test to guide courts in determining how much process is due in procedural due process cases. The Court first noted that due process is a flexible concept related to the "time, place and circumstances" where it is invoked. *Id.* at 334, 96 S.Ct. 893 (*quoting Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). Therefore, courts are instructed to weigh the private and governmental interests involved when determining how much process is due:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335, 96 S.Ct. 893. The private interest in having a correct test score is significant in that it is essential to the ability of each Plaintiff to be promoted in a fair, timely, and beneficial manner. Thus, each Plaintiff relies on the correct scoring of their examination in order to achieve career goals and enhance their professional and personal lives. However, the risk of wrongful deprivation of the interest in a correct test score through the procedures relied upon by the City is not substantial. The essential elements of due process are notice and an opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). In this instance, the City, through test administrators, afforded Plaintiffs the opportunity to challenge perceived problems with the test and its administration through the MFD's redlines. Test administrators reviewed approximately 264 redlines prior to releasing the initial lieutenant and battalion commander rankings, and made changes to the candidates' initial scores where appropriate. Further, after the release of the initial rankings, test administrators accepted additional redlines, some from candidates—like Plaintiff Richards—who had already submitted redlines, in a second, supplemental review process. In their second review process, test administrators carefully reviewed all submitted redlines and again made adjustments to scores and rankings where appropriate. As noted earlier, this second review process resulted in substantial increases in rankings for some candidates, including Plaintiff Richards. Thus, it is evident that the opportunity to be heard afforded by the City was both meaningful and substantially adequate when pursued with the diligence demonstrated by candidates such as Plaintiff Richards. Test administrators openly acknowledged that undertaking such a large and complex task as administering the promotional process naturally would entail the risk that some candidates might be slighted by arbitrary graders, faulty technology, or human error. In all instances the administrators attempted both to minimize the effect of those variables and to allow affected candidates to challenge the instances where they felt that those variables had rendered their score incorrect or unreliable.

Plaintiffs appear to be arguing that they are entitled to an opportunity to be heard that is limitless in both scope and duration. Test administrators' policy dictated that

disagreements with assessor scoring would not be reviewed unless that assessor's scoring was outside the acceptable range of judgment as determined by the decision model, or unless the scoring was based on an inaccurate or incomplete transcript. Plaintiffs complain that the City has not responded to their analysis of their tests and what they feel their correct scores should be. However, it is not reasonable to require the City to respond to the claims of candidates that, without the training or experience of the outside assessors, graded their own tests and assigned points to themselves based on their interpretation of their own answers. The City, through the test administrators, designed the scoring of the tests to be reliant on the judgment of experienced firefighters who were trained in how to interpret candidate responses in the most objective manner possible. Requiring the City to respond to the potentially endless barrage of claims that question the judgments of those assessors unreasonably expands the concept of a meaningful opportunity to be heard, particularly where, as here, it is doubtful that the Plaintiffs graded their own responses with the objectivity, expertise, and detachment of the outside assessors employed by the City.

These same concerns are implicated in the Supreme Court's third component to be weighed when determining how much process is due: the government's interest, including fiscal and administrative burdens that requiring additional or substitute procedures would entail. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. Unquestionably, the City has a significant interest in finality of the promotional process. The promotional process would be crippled if the City carried the oppressive burden of responding to every candidate's quibbles with the judgment of the assessors. Therefore, the Court concludes that the City has afforded the Plaintiffs the process to which they are due, and that imposing additional proce-dural requirements on the City would be unduly burdensome and oppressive.

Accordingly, for all the reasons given above, the Court concludes that Plaintiffs have not suffered a violation of due process rights guaranteed by the Fourteenth Amendment.

## II. EQUAL PROTECTION CLAIM

■ The Equal Protection Clause of the Fourteenth Amendment reads as follows: "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. The clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). As discussed above, Plaintiffs did not expressly plead an equal protection claim in their complaint, but in subsequent filings with the court they alleged that certain white fire suppression candidates were given favorable treatment by the city in that they were allowed to participate in the MFD promotional process without sufficient time in grade for promotion. For the reasons discussed below, Plaintiffs have failed to prove that any form of racial discrimination occurred during the MFD promotional process.

Because section 1983 claims for discrimination essentially mirror the requirements for proving discrimination in violation of Title VII, the Court will "rely on Title VII disparate treatment cases for guidance." *Sutherland v. Michigan Dept. of Treasury,* 344 F.3d 603, 614 (6th Cir.2003). Plaintiffs may establish a prima facie case of discrimination by presenting direct evidence of intentional discrimination by the City, or by providing circumstantial evidence sufficient to create the inference that discrimination occurred. *DiCarlo v. Potter,* 358 F.3d 408, 414 (6th Cir.2004). Plaintiffs

did not offer any direct evidence of racial discrimination affecting the promotional process. Further, Plaintiffs offered no circumstantial evidence that supports the inference of racial discrimination. At trial, Plaintiffs presented no evidence corroborating their earlier allegation that white candidates were allowed to participate in the promotional process without sufficient time in grade. Other than the vaguely articulated suspicion of impropriety in allowing Jason Stevens, a white male participating in the battalion chief promotional process, to serve as the MFD liaison with test administrators, Plaintiffs did not argue that they were treated differently than anyone else because of their race.

At trial, Plaintiff Jones testified that when he asked MFD Director Anderson, also an African–American, why Lt. Stevens was chosen to serve as liaison, Anderson replied "you know we can't trust you bros." Jones at 13. Though this statement, despite being attributed to an African–American, might be offered to suggest impermissible racial discrimination, standing alone it is not sufficient to show that the City discriminated against Plaintiffs. "In assessing the relevancy of a discriminatory remark, we look first at the identity of the speaker." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir.1998). Though the Court does not suggest that African–Americans may not impermissibly discriminate against other African–Americans in hiring or promotional processes, the fact that Director Anderson and other key decision makers in the MFD are African American mitigates the claim that African Americans were targeted for discriminatory treatment in the promotional process. Further, the remark, standing as it does as the only evidence of any discrimination, seems more of an isolated, off-the-cuff remark in a conversation between two African American MFD employees.

Though no nexus between a discriminatory remark and the personnel decision complained of is required, the lack of a nexus certainly affects the probative value of the remark as indicia of racism. *Id.* at 355. Plaintiffs are not complaining that MFD's decision to use Lt. Stevens as the liaison caused their purported equal protection violation, rather, their equal protection claim is construed from express complaints that some whites were allowed to compete in the promotional process despite not being qualified. If Director Anderson's statement, taken as true, had been offered in the context of the complained of personnel decision, it would more strongly indicate impermissible racial discrimination. Jones' testimony regarding the remark made by Director Anderson seems more to bolster his suspicion that Stevens' dual role afforded him and perhaps others some advantage in the promotional process. However, "mere personal belief, conjecture and speculation are insufficient to support an inference of ... discrimination," *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 247 (6th Cir.1997), and the testimony of Dr. Jones was that Stevens enjoyed no benefit in the promotional process due to his role as liaison. Dr. Jones at 136–137. Therefore, given the isolated nature of the remark attributed to Director Anderson, the identity of the speaker, and the context in which it was allegedly spoken, the Court concludes that Plaintiffs have not established a prima facie case of racial discrimination as is required in such cases. Accordingly, the Court concludes that Plaintiffs have suffered no violation of rights guaranteed them by the Equal Protection Clause of the Fourteenth Amendment.

### III. CONCLUSION

For all the reasons given above, the Court ENTERS judgment in favor of the Defendant City of Memphis. Though the

Court has held that Plaintiffs did not sufficiently establish a prima facie case of racial discrimination and that they were afforded sufficient due process, the Court finds that Plaintiffs brought their claims in good faith, and therefore this case is not an egregious case of misconduct warranting the extreme sanction of awarding attorney's fees against the Plaintiffs. *Jones v. Continental Corp.*, 789 F.2d 1225, 1232 (6th Cir.1986). Therefore, the Court DENIES Defendant's request for an award of attorney's fees.